IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNNY E. WEBB, III | § | CASE NO.: 2:21-cv-12088-CCC-AME |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| DIVERSEGY, LLC, DOMINION GAS | § | JURY TRIAL DEMANDED |
| HOLDINGS, LP, IDT ENERGY, INC., | § | |
| GENIE ENERGY SERVICES, LLC f/k/a | § | |
| SHUK HOLDINGS LLC, | § | |
| LUCIEN J. TUJAGUE, JR., ALEX | § | |
| RODRIGUEZ, SAMIR AKHTARKHAVARI | § | |
| a/k/a SAM KHAVARI, AND JOHN DOE | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiff, JOHNNY E. WEBB, III, complains of the Defendants DIVERSEGY, LLC,

DOMINION GAS HOLDINGS, LP, IDT ENERGY, INC., GENIE ENERGY SERVICES, LLC

f/k/a SHUK HOLDINGS LLC, LUCIEN J. TUJAGUE, ALEX RODRIGUEZ, SAM KHAVARI,

and JOHN DOE and for causes of action against them would show the Court as follows:

### I.   INTRODUCTION, NATURE OF ACTION AND RELIEF SOUGHT

1.      This is a case about fraud, forgery, theft and the cover up.

2.      Accordingly, this action seeks compensation, punitive, liquidated, and actual damages,

declaratory and injunctive relief, any lawful interest, and attorney's fees, costs and expenses due

to Defendants fraudulent conduct and breach of various contracts.  This is also an action for

declaratory judgment pursuant to 28 U.S.C. §2201 to declare the rights and other legal relations

between the parties. The Plaintiff is also seeking equitable and injunctive relief.  Plaintiff demands

1

a jury for any and all issues triable to a jury.

### A. The Fraud of Seller Defendants Tujague, Rodriguez and Khavari

3.     When Diversegy executives mismanaged the company into a financial crisis, these executives and majority shareholders conspired to sell the foundering insolvent company for their own self gain and to cover their own debts, while converting Plaintiff's interests, forging his signature, and hiding debt that was owed to him.

4.     They hid the indebtedness to Plaintiff because they knew if the hundreds of thousands owed was disclosed the company would not sell. To further conceal their fraudulent conduct, these executives forged Plaintiff's signature on to sales transaction documents.

5.     In its simplest terms, this case has ballooned across multiple courts and now two states because Defendants have failed, at multiple opportunities, to produce an original signature page bearing Mr. Webb's "wet and imprinted" signature.

6.     In the initial lawsuit filed in 2014, Defendant Tujague was ordered to produce the original document by Temporary Restraining Order. He produced only a color copy.[1]

7.     In September 2014, to refute Mr. Webb's assertions of forgery during a motion to transfer venue, Defendant Sellers Tujague, Rodriguez and Khavari put forth perjured affidavits accusing Mr. Webb of signing the Uniform Purchase Agreement ("UPA") at issue at a signing party.

8.     The forgery was committed because these three Defendants knew Mr. Webb would not participate in a sales transaction that did not include payment of the hundreds of thousands of

---

[1] Initially, Judge Tonya Parker of the 116th Civil District Court issued the TRO sitting temporarily over that proceeding.  It was Judge Molberg of the 95th Civil District.Court who presided thereafter. Judge Molberg physically held in his hand the color copy referenced and acknowledged that there was not an imprint of Mr. Webb's signature. App. 05, Transcript, pp. 24-26.  Yet, Judge Molberg failed to order the production of the original. Further while refusing to issue findings of fact upon timely request, Judge Molberg in effect set forth the Courts' reliance upon the perjured affidavits. *Johnny E. Webb, III v. Alex Rodriguez, Cesar Garcia, Diversegy, LLC, Lucien J. Tujague, Jr., Dominion Gas Holdings, LP, Nicholas Gallagher, IDT Energy, Inc., and Shuk Holdings, LLC*, Cause No. DC-14-09393.

dollars owed to him by the company.

9. The material misrepresentation made by these Defendants to Mr. Webb was that they were working on numbers for the sale of the company that included his commissions as debt.

10. Further, Mr. Webb was told by Defendants Tujague and Rodriguez that they did not want to give the appearance of "in-fighting" because it could ruin any deal.

11. On several occasions, Defendant Tujague told Mr. Webb to talk to Defendant Rodriguez because he was "working the numbers."

12. Mr. Webb was not included in any meetings, emails, or phone calls about the terms or conditions of the sale of the company.

13. He was led to believe that any sale of the company would include terms that he would be paid the money owed to him by the company.

14. Notably, Defendant Tujague claimed in his perjured affidavit that he took the original UPA from the so-called "signing party" and gave it to his attorney. Based on information and belief, the attorney for Tujague was David R. Cragle, who is General Counsel for RREAF Holdings, where Tujague serves as Partner and Vice Chairman.[2]

15. Yet no attorney has come forward and confirmed that he received the original UPA from this so-called party. No attorney has come forward and confirmed there was a signing party or that he participated in securing any signature to a multi-million dollar contract whereby its authenticity has been challenged. No attorney has come forward through the years of litigation to say that he has the original in his possession.

16. To the contrary, lawyers have knowingly or recklessly caused the judicial system to rely upon these perjured affidavits committing fraud upon the courts. It was attorneys for Defendants

---

[2] https://rreaf.com/team-collection/Lucien-J-Tujague-Jr

Tujague and Rodriguez who handed a color copy of the UPA to Mr. Webb and the Court during a motion to transfer the venue to New Jersey.

17.     No attorney has come forward to produce original sales documents, particularly the UPA, bearing Mr. Webb's signature because an original bearing Plaintiff's signature does not exist and never existed.

18.     The wrongful conduct of these Defendants have caused Plaintiff great harm and constitute a fraud upon the courts.

19.     Any responsive pleading to this Amended Complaint should include the original document bearing Mr. Webb's "wet and imprinted" signature. Anything less will be a further waste of judicial resources and should be considered sanctionable conduct by this Court.[3]

### B.     Fraud by the Defendant Purchasing Companies

20.     Equally troubling, this case is about purchasing companies, that took part in the fraudulent transfer of stock. When put on notice by Plaintiff of the fraudulent conduct of Defendants Tujague, Rodriguez and Khavari, those companies turned a blind eye, and then later claimed in arbitration that fraud had been committed against them in the sales transaction.

21.     Plaintiff sent a letter to Human Resources and Bruce Schlanger warning them that he was being defrauded. He spoke with the Human Resources executive who represented that if they paid Plaintiff, they would later have to sue Defendant Tujague. Soon after, the purchasing companies were informed of the forgery and perjury by Defendants.

22.     Based on the partial commission payments to Plaintiff in 2015, 2016 and 2017, Defendants knew, or should have known they were participating in continued fraud and conversion of Plaintiff's compensation owed.

---

[3] Plaintiff's First Request for Production, Interrogatories and Admissions is served with this Complaint.

23.     The purchasing companies are joined at the hip with Defendants Tujague, Rodiguez and Khavari in every wrongful act committed which forms the subject of this litigation.

24.     IDT and Genie decided defended the wrongful conduct of Defendants Rodriguez and Khavari and took the side of Defendant Tujague by misrepresenting to the public and their stakeholders that they had acquired a successful company.  They not only acquiesced to the fraud, but they also aided, abetted, and participated in it. Their payments of partial commissions through 2017 are an inadvertent admission of their own misdeeds.

### C.     The History of Fraud of Defendants Rodriguez and Khavari.

22.     When Mr. Webb helped create Diversegy, he stepped into a family dynamic where the Chief Executive Officer - Defendant Alex Rodriguez, and the Chief Financial Officer - Caesar Garcia were close cousins.

23.     More importantly and unbeknownst to him at the time was the relationship between Rodriguez and Sam Khavari.

24.     In *Stream Gas and Electric, LTD vs. Samir Akhtarkhavari a/k/a Sam Khavari[4]*, Defendant

---

[4] Case No. 3:09-cv-02261.  Of note, Hallet & Perrin PC attorney Monte K. Hurst (who joined the firm in June of 2015 according to his LinkedIn page) represented Stream Gas in the 2010 lawsuit against Khavari. This same law firm also represented Defendant Diversegy, LLC in two lawsuits brought by Mr. Webb in 2014 and 2016., *Webb v. Diversegy, et al,* Cause Nos. DC-14-09393 and DC-16-14649. At all times relevant to this case, Khavari was employed by Diversegy starting in 2010 until 2013, then the Diversegy subsidiaries Epiq through 2015 and Genie Solar Energy through 2017, according to his LinkedIn page. See also App. 02, Genie Energy Ltd. Corporate Structure.  This relationship dynamic raises at a minimum a question about whether there is the appearance of impropriety where the same attorney that represented Stream Energy in the lawsuit accusing Defendants Khavari and Rodriguez of a multitude of fraudulent acts, worked for the same law firm that represented Diversegy (and by extension Khavari and Rodriguez) in the prior litigation brought by Mr. Webb. At all times relevant to this litigation, and according to the law firm website, Monte K. Hurst (who represented Stream Energy) and Bryan P. Stevens (who represented Diversegy) were shareholders at Hallet & Perrin PC. Hallett & Perrin PC (hallettperrin.com).

Hallett & Perrin should be disqualified from representing Diversegy or other parties in this matter.  (*See* R.P.C. 3.7 authorizing disqualification of the client's attorney where that attorney's trial testimony is "necessary" and "likely." A purpose of that limited remedy is to prevent unfairness to the opposing party).  Likewise the law firms of Gray, Reed & McGraw, P.C. that represented Defendants Tujague and Dominion Gas Holdings, L.P and Gruber, Hurst, Johansen, Hail, Shank, LLP that represented Defendant Rodriguez in the aforementioned cases should be disqualified, along with Hallett & Perrin P.C.. These firms and their lawyers should be disqualified because of the questions surrounding the creation and submission of the perjured "Rodriguez affidavits" made one of the basis of this lawsuit. Further the attorneys continued to rely upon the same perjured affidavits after having received notice of the same by Plaintiff, an

Khavari was described as the "protege and chief lieutenant" of Defendant Rodriguez[5].

25. Similar to this case, Stream Gas[6] accused Defendant Khavari and co-conspirator Alex Rodriguez of a multitude of fraudulent acts.

26. It was alleged that Defendant Khavari covertly co-conspired with others, including Defendant Rodriguez to acquire a vital department of Stream Gas, as well as Stream Gas itself by stealing confidential proprietary information and manipulating certain values over a two year period of 2007 to 2008.[7]

27. Khavari was sued by his former employer Stream for breach of fiduciary duty, trade secret misappropriation, common law misappropriation, usurpation of corporate opportunities, constructive fraud, breach of contract, negligent misrepresentation, fraud, civil conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act.

---

expert forensic examiner and disinterested former Diversegy manager. Attorney Stevens argued that he would not have submitted perjured evidence. App. 03, Excerpt of Transcript,57:1-5.

[5] Based on information and belief, the person described as "Senior Executive A" in the Original Complaint is Alex Rodriguez. Note footnote no. 12 that includes the reference to Caesar Garcia as the cousin of Senior Executive A.

[6] Stream Gas, a/k/a Stream Energy appears to be a model for Diversegy in many respects. In its complaint it described itself as having been founded in 2004 as a retail electricity and natural gas provider headquartered in Dallas, Texas and active in the Texas and Georgia deregulated energy markets. Like Diversegy "Stream Energy procured electricity and natural gas in amounts necessary to meet the needs of its served customers…", Additionally like Diversegy's subsidiary Epiq, Stream had Ignite, its "wholly-owned marketing arm" created as "a multi-level marketing strategy to recruit and service residential customers located in areas of Texas and Georgia that permit consumers to choose their own electricity or gas providers." Ignite associates, like Diversegy/Epiq representatives, earn[ed] income from the recruitment of both customers and associates as well as additional compensation in the form of fixed residual payments from the paid bills of electricity customers within their respective downline networks."

The confidential information Defendants Khavari and Rodriguez were accused of fraudulently using included "trade secrets, customer lists and customer-related information, supplier lists and prices, pricing schedules, methods, processes and marketing plans", "rate and price information concerning energy products and services provided/offered, the firm's sensitive financial information (including revenues, expenses, capital expenditures, profits and losses, sources of financing, tax reporting, investments and acquisitions) as well as its sales and marketing programs, purchasing and scheduling techniques, compensation and benefits paid or offered to officers and employees and the deliberations of its internal management and corporate governance processes." App.01, Stream Energy Original Complaint, ¶¶ 5-7, and 10.

[7] App. 01, Original Complaint in *Stream Gas v. Khavari*

28.     Stream Gas sought recovery of all salary, bonuses and other compensations, including Class A units of limited partnership interests awarded to Khavari. The case ultimately settled in March of 2010.

## II.     <u>JURISDICTION AND VENUE</u>

30.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

31.     Venue of this action is proper in this court, pursuant to 28 U.S.C. § 1391(b).

## III.     <u>PARTIES</u>

32.     The Plaintiff, Johnny E. Webb, III, is a resident of Harris County, Texas.

33.     The Defendant Diversegy, LLC ("Diversegy" or "Company" or "Genie Defendant") is a limited liability company authorized to do business in Texas and headquartered in New Jersey. At all times relevant to this action, Diversegy had its primary place of business at 5080 Spectrum Drive, Suite 600W, Addison, Texas 75001.  Its current primary place of business is at 520 Broad Street, Newark, New Jersey 07102.  It is a subsidiary of publicly traded Genie Energy (NYSE:GNE, GNEPRA). Diversegy can be served with process through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

34.     The Defendant Dominion Gas Holdings, LP ("Dominion" or "Dominion Defendant") is a Texas limited partnership and may be served through its registered agent, Lucien J. Tujague, Jr. at 2720 N. Stemmons Freeway, Suite 700 South Tower, Dallas, TX 75207 or 1909 Woodall Rodgers Fwy, Third Floor, Dallas, TX 75201 or 4824 Crooked Ln, Dallas, TX 75229. Dominion was a majority equity owner of Diversegy at all times relevant to this action.

35.     IDT Energy, Inc. (hereinafter "IDT" or "Purchaser" or "Genie Defendant") is a corporation duly incorporated and organized under the laws of Delaware, having its principal office at 550

Broad Street, Newark, New Jersey. IDT is identified as a "Parent" company in the Unit Purchase Agreement ("UPA") at issue in this case. IDT may be served with process through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

36.     Genie Energy Services, LLC (hereinafter "Genie" or "Genie Defendant") formerly known as Shuk Holding LLC (hereinafter "Shuk" or "Purchaser") is a limited liability company duly formed and organized under the laws of the state of Delaware, having its principal office at 550 Broad Street, Newark, New Jersey. Genie may be served with process through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.     Lucien J. Tujague, Jr. ("Defendant Seller", "Tujague" or "Dominion Defendant") is an individual residing in Dallas County, Texas. He may be served at 2720 N. Stemmons Freeway, Suite 700 South Tower, Dallas, TX 75207 or 1909 Woodall Rodgers Fwy, Third Floor, Dallas, TX 75201 or 4824 Crooked Ln, Dallas, TX 75229. Tujague was a majority equity owner of Diversegy at all times relevant to this action. He was also the Escrow Agent for the purchase and sale of Diversegy.

38.     Alex Rodriguez was the Chairman and Chief Executive Officer of Defendant Diversegy. He was also a founder of the company. Rodriguez is identified as a management seller in the UPA. He is an individual residing in Dallas County, Texas and may be served with process at his residence 6549 Villages Springs, Plano, TX 75025 or wherever he may be found.

39.     Sam Khavari was the Vice President of Strategy and Planning of Defendant Diversegy. He is also recognized as a founder of the company. Khavari is identified as a management seller in the UPA. Khavari is an individual and it is believed that he is residing in Dallas County, Texas and may be served with process at 3500 Maple Ave., #440, Dallas, TX, 75219 or wherever he may be found.

40.     John Doe, based on information and belief, is understood to be an attorney(s) that was involved in the negotiation and closing of the sale of Diversegy. This attorney(s) would have had fiduciary duties and contractual obligations directly and indirectly to Plaintiff concerning the sale. Moreover, this attorney(s) had duties to the Court that were breached. Further this attorney(s), based on information and belief, practiced in Texas and New Jersey on behalf of sellers and purchasers.[8] Further this attorney has in his possession a substitute copy of the original signature page, that he held out and represented it to be the original, knowing that it was not an original.

41.     At all times material hereto, Defendant companies acted or failed to act through their authorized agents, servants, workmen and employees who were at all times then and there acting within the course and scope of their authority and employment.

42.     All of the claims herein arise out of the same course of fraudulent and deceitful conduct by all Defendants. The specifics of these allegations, as well as necessary information and documentation, were at all times relevant hereto within Defendants' knowledge, possession and exclusive control.

## IV.     MOTION FOR SPOLIATION ANALYSIS

43.     Plaintiff hereby requests and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom, including business agreements, statements, photographs, videotapes, audiotapes, recordings, business records, financial records, bills, estimates, invoices checks, correspondence, memoranda, files, facsimiles, email, voice mail, text messages, and any electronic image, data, or information related to the referenced incident and allegations herein. Failure to

---

[8] The law firm Schwell Wimpfheimer & Associates LLP represented IDT during the sales transaction. *SWA advises IDT Energy on its Acquisition of Diversegy, LLC | Schwell Wimpfheimer & Associates LLP (swalegal.com)*. Attorney David R. Cragle was, at all times relevant to this action, the personal attorney of Tujague.

maintain such items will constitute "spoliation" of the evidence.

44.    Plaintiff asserts that he never signed the UPA, consents, Waterfall Agreement or other sales related documents.  Plaintiff further asserts that he never approved or authorized the sale of the company or his interests in the company.

45.    It is undisputed that Plaintiff has never received or observed an original of the UPA, accompanying schedules, consents, certificates of minutes, or exhibits bearing his signature, despite numerous requests for the same.

46.    Therefore, before this Honorable Court should consider a Motion to Dismiss or any other pleading by Defendants, Plaintiff moves for a spoliation analysis so that judicial economy and due process are preserved.[9]

47.    Based on information and belief, Plaintiff asserts that Defendants Tujague, Rodriguez and Khavari intentionally and in bad faith destroyed and significantly altered original documents related to the sale of Diversegy, including the original signature pages of the UPA, emails and text messages.

---

[9] I believe you cannot have "trial by affidavits". The perjured "Rodriguez Affidavits" have never been tested nor has the testimony of those affidavits been cross-examined. Yet Judge Molberg, as the trier of fact, accepted them untested. The court of appeals, relying upon Judge Molberg affirmed his judgment. When I appeared before the Court of Appeals, Judge Molberg had recently been seated, having been supported by the campaign contributions of Defendant law firms. App. 06, Letters.  The Motion to Dismiss was argued on March 30, 2017. The Gray Reed  firm that represented Defendant Tujague contributed $500 to Molberg's campaign on March 6, 2017. The Hallet & Perin firm and its partner each contributed $500 in January and November, 2017 respectively.  On the same day in November, 2017 Gruber Hail Johansen Shank LLP, the firm representing Defendant Rodriguez, also contributed $500 to Molberg's campaign. I filed the appeal November 1, 2017.  As a layman using common sense, this cannot all be coincidental. Maybe campaign events were attended by, or sponsored by the law firms or a decision was made jointly to make these contributions. Likewise in the 2014 initial litigation, both the Hallet and Gruber law firms contributed to Molberg in September in the days before the Motion to Transfer Venue. These donations and their timing create an appearance of impropriety.

The very nature of litigation, as I understand it as a layman, is that parties challenge the evidence, test it, cross-examine it to get to the truth so that a juror or other trier of fact can reach a fair and just decision. Litigation defined in Black's Law Dictionary is a "contest in a court of justice, for the purpose of enforcing a right." A contest is defined as "to make defense to an adverse claim in a court of law; to oppose, resist, or dispute…" None of the claims in this case have been contested or litigated. The argument that Judge Molberg considered all of the affidavits does not meet the standard of litigated, or New Jersey's doctrine of law of the case, collateral estoppel or res judicata. There can be no "re-litigation" of any of the claims asserted in this Complaint because none of these claims have been tried or resolved.

48.    Additionally, all of the Defendants have failed to preserve original documents related to the sale of Diversegy in instances where litigation was pending or reasonably foreseeable and in violation of fiduciary duties and laws requiring that they do so.

49.    Spoliation occurs where the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. UPS*, 665 F.3d 68, 70 (3d Cir. 2012)

50.    The Defendants have not made any assertions that the original UPA and accompanying documents bearing Plaintiff's signature were lost or accidentally destroyed or that the failure to produce such documents was somehow otherwise accounted for.

51.    Defendants Tujague, Rodriguez and Khavari have concocted a story that Plaintiff was observed signing the UPA at a "signing party" yet it is undisputed that Defendants do not have any supporting documents, emails, texts or statements other than their own self-serving perjured affidavits ("Rodriguez Affidavits")[10] to support their fabricated story.

52.    Defendant Sellers did not allege that attorney John Doe or any other attorneys attended this so-called signing party.

53.    When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's non-production or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him. *Id.* A party's failure to produce a document can have the same practical effect as destroying it and under certain circumstances, non-production of evidence is rightfully characterized as spoliation." *Id.*

---

[10] <u>App. 04</u>, Rodriguez Affidavits

54.     Plaintiff moves for a spoliation analysis and requests that this Court enter an Order *sua sponte* at the first available opportunity that it deems appropriate.

## V.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

55.     Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

56.     In 2010, Plaintiff, Defendants Rodriguez, Khavari and others formed the energy company Diversegy.[11]  It was formed as an energy brokerage and advisory company, hence an energy sales company, which provided energy services to customers in the commercial, industrial and residential arenas across several markets nationally.

57.     As a founding member of Diversegy, LLC and Vice President of Sales and Marketing, Johnny E. Webb, III not only earned the highest sales numbers, he trained brokers and sales representatives, developed sales and marketing strategies, and traveled the country acquiring new commercial business.

58.     Soon after the formation of Diversegy, LLC, Mr. Webb created the Diversegy Consultant Program, LLC ("DCP").  The DCP engaged business professionals with energy brokerage opportunities to earn residual income while at the same time creating strong revenue for Diversegy. DCP became a lucrative channel from which Plaintiff was promised compensation but never received.

59.     For nearly a year after its inception Webb agreed to defer compensation on the promise

---

[11] Unbeknownst to Plaintiff, in March of 2010 Defendant Sam Khavari settled litigation in the *Stream Energy* case. The similarity of the fraud alleged in the Stream Energy case to the case at bar is striking. There Khavari, Rodriguez and an unnamed wealthy "funding co-conspirator" not employed by Stream Energy attempted to persuade Stream Energy executives to give Rodriguez the Wholesale Department to manage as a separate company. When persuasion was unsuccessful, Rodriguez, Khavari and this funding co-conspirator allegedly set about to swindle the department from Stream Energy and later schemed to fraudulently take the whole company. App. 01, Original Complaint in *Stream Gas v. Khavari*. Similarly here, Rodriguez, Khavari and Tujague conspired to steal Plaintiff's interests and compensation, selling the company and his interests without his authority.

that his sweat equity would net financial prosperity for him and Diversegy.

60.     Not only did Webb meet the demands of generating business and sales, Diversegy's largest and most profitable deals during that time were closed by Webb.

61.     He was known as The Whale Hunter - a term used at Casinos identifying big paying clients. Webb was the resource for high value and lucrative client contracts. Thousands of accounts and millions of dollars were generated and earned due to Webb's deals and sales strategies.

62.     One such account was the multi-level marketing ("MLM") channel 5LINX. 5LINX is a MLM network with thousands of members nationwide.[12]

63.     Webb helped to secure the 5LINX sales channel by way of Diversegy's very attractive energy platform.[13] As the company's star closer, Webb touted the ability to secure untold amounts of income by way of his "proprietary" sales technique which was sure to work for all MLM representatives, thus increasing their capture rate, and thus their income.

64.     Webb and Diversegy contracted for Webb to receive compensation via commercial sales commissions, sales channels and in residual income from the MLM field via Epiq Energy[14]. His commissions were earned and compensation was to be received over the life of the underlying customer account energy contract per this particular sales channel, which was one of the many (i.e. DCP, Sales floor, 5Linx are all sales channels). Some contracts had terms of 3-5 years with optional or automatic renewals. Plaintiff received partial commissions payments over the course of several years including 2015, 2016 and 2017.

65.     There is no doubt that other executives who were either very close to the CEO or related to him, including the CEO himself and Defendant Tujague, all benefited financially from Webb's

---

[12] 5LINX was a predominately Black MLM network. No one at Diversegy could connect with 5LINX as effectively as Mr. Webb did, being a Black man with his level of sales/marketing expertise.
[13] The energy platform had to be attractive as it competed with the many products that the MLM constantly maintains.
[14] A subsidiary company of Diversegy, LLC.

hard work and sales commissions while simultaneously exploiting his efforts. Genie Defendants also benefitted after the sales transaction at issue and after being notified of the commission's theft. While benefitting from said theft, Genie Defendants made partial commissions payments rather than making Plaintiff whole by paying him all commissions owed.

66. Webb was told to wait. The debt owed to Webb as of 2014 is estimated at well over half of a million dollars. The following chart illustrates that as of March of 2014 on just four (4) accounts Webb, as the "commissions-motivated sole closer" of these deals, as well as the Sales Executive, was owed certain percentages that equated to $562,826.90:

| Sales Channel or Accounts | Volume / Kilowatt Usage Total | Value at .001 to .005 per Kwh | Monthly Payout Owed | Annual Pay Owed | Total Owed Over Length Of Contract |
|---|---|---|---|---|---|
| STEMMONS TOWERS | 25,331,980 | $25,331.98 (@ .001) | $469.11 | $5,629.33 | $28,146.64 (5 year term) |
| *Webb was to receive 50% commission on the above account. Kwh x .005 (50% of a penny) but was only paid 40%. These numbers reflect the 10% owed.* | | | | | |
| SHINDA | 45,320,905 | $135,962.72 (@ .003) | $3,776.74 | $45,320.91 | $226,604.53 (3 year term) |
| CITY OF MARKHAM | 5,501,994 | $27,509.97 (@ .005) | $764.17 | $9,169.99 | $45,849.95 (2 year term) |
| RUTLAND RD | 31,467,093 | $157,335.47 (@ .005) | $4,370.43 | $52,445.16 | $262,225.78 (3 year term) |
| *For example; Kwh x .003 of a penny* | | | | | |

The exact amount owed must be determined based on the terms and life of each energy sales contract. The Stemmons Towers deal referenced in the chart above was a renewable 5-year term contract. Based on information and belief, Plaintiff is owed compensation on multiple long term renewable contracts extending well into 2017. It is likely that Genie Defendants continue to operate converting compensations owed to Plaintiff on contracts closed by Plaintiff, such as Chuck E

Cheese.[15] At all times relevant hereto Defendants have in their possession and control all such contracts and have withheld the same from Plaintiff.

67. It is undisputed that the operations of Diversegy and DCP were supported substantially by the revenues from Mr. Webb's sales performance. In fact, it was Plaintiff's hard work and sales deals, channel creation, proprietary sales techniques and voluminous online sales training that in great part positioned the then insolvent company to be sold and continue as a profitable company today.

68. For the record - there was not another member of the company that was capable of (1) out selling or closing major deals; (2) outperforming or training and creating sales collateral and videos; (3) out earning commissions generated per sales channels, marketing collateral and call center sales support; or (4) being out in field travelling and training nationwide as the corporate trainer representative to increase and drive sales.

69. Nevertheless, by the end of 2011 the company was in serious financial trouble. Its liabilities greatly exceeded its revenue and assets. It is believed that the company's 2011 annual tax return reported a loss.

70. Midsummer 2012 the company received a loan from Defendant Tujague in the amount of $350,000.00. The loan required the personal guarantee of Defendant Rodriguez to further secure the indebtedness. The loan was utilized to pay off notes on debts previously received.

71. Sometime shortly thereafter, based on information and belief, Defendant Dominion Gas Holdings ("Dominion"), Tujague's company, contributed almost one million dollars in effort to save the company yet again.

---

[15] Chuck E Cheese was a long-term contract with a renewable term closed by Plaintiff on or about 2013. Today the Diversegy website represents "We are trusted by some of the nation's leading brands" and lists Chuck E Cheese as one of the brands. https://diversegy.com/about/

72.    Again, Defendant Rodriguez provided a personal guarantee on the loan. Rodriguez reportedly put up his home as collateral and signed as personal guarantor on a substantial note, risking the livelihood of his wife and four children.

73.    Defendant Dominion was now the majority interest owner with 51% ownership interest in the company. Defendant Tujague remained a majority interest owner.

74.    On the heels of the influx of cash, Defendant Diversegy formed its subsidiary company Epiq Energy, LLC. Mr. Webb's creativity worked to the benefit of Diversegy creating the namesake of the subsidiary - having created everything from scratch about Epiq except the commission platforms. Epiq was formed as a multi-level network marketing company intended to provide residential customers with energy products.[16]

75.    At all times relevant to this action, Plaintiff was encouraged specifically by Defendants Tujague and Rodriguez to land the big deals and close contracts for energy.

76.    During this time Defendants Tujague and Rodriguez promised Plaintiff that full payment of all commissions earned would be paid when the company sold, but never disclosed to Plaintiff the details of the sale or involved Plaintiff in meetings or communications about the transaction.

77.    Defendants Tujague and Rodriguez refused Plaintiff's numerous demands for payment of commissions earned prior to the sale and after. Defendants have refused to pay Plaintiff any of the debt owed to him or for the sale of his ownership interest.

78.    Despite what appeared to be strong operations, by mid-summer 2013 Diversegy was again in serious trouble financially due to the poor financial management skills of Defendants Rodriguez and Khavari. The liabilities exceeded its assets, and the company could not meet its daily operational costs. The company had no history of profitable operations.

79.    Defendant IDT in an arbitration filing (discussed below) described the state of Diversegy as follows: "By the second half of 2013, Diversegy was foundering. A key partnership had been severed, key personnel had departed, and the company was losing money. Management was under

---

[16] According to Genie Energy Ltd. Corporate Structure Epic is now IDT Energy Network, LLC. <u>App. 02</u>.

pressure to lure a buyer and secure an exit for the Sellers."[17]

80.     On December 5, 2013, unbeknownst to Plaintiff, the Unit Purchase Agreement ("UPA") was purportedly entered into and Diversegy, Epiq, and DCP were sold to Defendants IDT and Genie (formerly Shuk) for $2,000,000.00.

81.     Plaintiff never reviewed the UPA or any provision or term of the UPA. The terms nor conditions of the UPA were ever discussed with Plaintiff.

82.     Plaintiff's signature was forged onto the UPA signature page.

83.     After the sale and being given notice of demands for payment and the forgery, Defendants have refused payment of Plaintiff's commissions and ownership interest.

84.     Defendants Tujague, Rodriguez and Khavari ("Defendant Sellers") withheld the terms and conditions of the sale of Diversegy and refused to give Plaintiff a copy of the Unit Purchase Agreement to conceal the forgery of Plaintiff's name.

85.     Additionally, Defendants Sellers colluded to eradicate evidence of the obligation to pay Plaintiff because the total owed would have been a debt that greatly diminished the company sales price of $2,000,000.00.

86.     The concealment of the indebtedness to Plaintiff was done fraudulently converting the owed monies to manipulate and misrepresent the valuation of the company.

## A.     FIRST LAWSUIT AND APPEAL

87.     In the spring of 2014 Mr. Webb learned that the sale of Diversegy had been finalized.  He had been kept out of the details, out of meetings and out of the closing. When Plaintiff requested sales transaction documents, Management Seller Debra Allen directed him to Defendant Genie's in-house counsel Bruce Schlanger.

88.     Schlanger represented that he did not have an original document and forwarded a copy via

---

[17] *Nicholas Gallagher and Dominion Gas Holdings, LP, v. IDT Energy, Inc. and Shuk Holdings LLC*, Case 01-15-0005-7819, IDT Answering Statement and Counter-claims.

email. Webb's receipt of the copy was the first time he ever saw the UPA.

89.    Webb learned upon review of the copy that there was a scheduled payment in the amount of $417,000.00 to be made on December 4, 2014.

90.    Mr. Webb sought to stop the consummation of the sale and remaining installment payments by filing suit and seeking a Temporary Restraining Order.

91.    On August 29, 2014 in Dallas, Texas state court Plaintiff filed an Amended Application for Temporary Restraining Order ("TRO") and Petition against Defendants Tujague, Rodriguez, Diversegy, Dominion Gas Holdings, LP, and IDT Energy, Inc. Plaintiff also sued purchaser Shuk Holdings, LLC and Sellers Nicholas Gallagher and Cesar Garcia.[18]

92.    These parties were sued for fraud, misrepresentation, conversion, breach of contract and breach of fiduciary duties arising before, during and after the sale of Diversegy.

93.    The TRO was granted and Defendants were ordered, among other things, to produce sales transaction documents including the original signature page of the UPA.

94.    Plaintiff went to inspect the documents at the law office of counsel for Tujague and Dominion. However, no original bearing Plaintiff's signature was produced, nor were any copies of sales documents provided. Instead, a color substitute of the signature page of the UPA was shown to Plaintiff.

95.    On September 9, 2014[19], Defendant Tujague filed a Motion To Transfer Venue Pursuant to Tex. Civ. Prac. & Rem. Code §15.020, and Subject Thereto, Alternative Motion To Dismiss based on the Forum Selection Clause in the Unit Purchase Agreement ("motion to transfer"). Later,

---

[18] *Johnny E. Webb, III v. Alex Rodriguez, Cesar Garcia, Diversegy, LLC, Lucien J. Tujague, Jr., Dominion Gas Holdings, LP, Nicholas Gallagher, IDT Energy, Inc., and Shuk Holdings, LLC*, Cause No. DC-14-09393.
[19] On August 27, 2014, Defendant Tujague's law firm Hallet & Perrin's partner Edward Perrin contributed a $1000.00 campaign donation to Judge Molberg. On August 30, 2014, Defendant Rodriguez's attorney and partner Mark Johansen of the Gruber law firm donated $500.00.

all Defendants joined in the Motion To Transfer Venue.

96.     On September 23, 2014, the same day as the hearing on the motions, Defendants Tujague and Dominion filed their Reply Brief In Support of Motion.  To refute Webb's contention that the forum selection clause did not apply to him because his signature was forged on the UPA, Respondents filed with their brief affidavits executed by Rodriguez, Tujague and Khavari ("Rodriguez Affidavits") falsely averring that Webb attended a "signing party" where they observed him sign the UPA.

97.     The Court granted the motion to transfer. Plaintiff soon after filed a Rule 329b Motion (motion for reconsideration) and request for findings and conclusions.

98.     Plaintiff's motion included an affidavit from a forensic document examiner who cited deviation in Mr. Webb's signature on the UPA, as well as affidavits from co-founder and Management Seller Fernando Campos and Mr. Webb that the signing party was a fabrication and Mr. Webb did not sign the UPA.

99.     The motion was denied and an appeal followed.

100.    The Sixth Court of Appeals affirmed the decision of the trial court granting the motion to transfer, holding that the appellees met their burden to show that the forum selection was enforceable against Webb because he attached "an executed copy" of the UPA.[20]

## B.      TEXAS ARBITRATION

101.    On December 24, 2015, Sellers Nicholas Gallagher and Dominion (both majority shareholders of Diversegy) submitted their Demand for Arbitration against IDT and Shuk Holdings LLC (now Genie) for breach of contract (UPA) and other claims.[21]

---

[20] *Webb v. Rodriguez, et al.,* No. 06-14-00102-CV, 2015 Tex. App. LEXIS 5564, at *1 (Tex. App. June 3, 2015).
[21] *Nicholas Gallagher and Dominion Gas Holdings, LP, v. IDT Energy, Inc. and Shuk Holdings LLC*, Case 01-15-0005-7819.

102.    Dominion challenged IDT's right to withhold the final purchase price installment and use of the setoff amount for fraud and gross negligence, as well as indemnification of legal fees incurred because of Mr. Webb's first lawsuit.

103.    IDT answered and sued Mr. Webb and other Management Sellers (except Khavari), for fraud, breach of contract, and sought a declaratory judgment.

104.    In their fraud claim, IDT alleged that arbitration respondents "grossly and recklessly overstated Diversegy's book of business by making material misrepresentations as to the accuracy of Diversegy's customer lists and by providing unfounded renewal-rate projections."

105.    IDT intentionally left Khavari out of the arbitration suit with knowledge that Khavari was an integral participant, along with Rodriguez, in the sales transaction.  Khavari was the Senior Vice President of Operations and accompanied Rodriguez all times relevant to the sales transaction at issue.

106.    IDT alleged that the Management Sellers also defrauded IDT by "providing baseless and inflated projections for customer renewal rates, a critical variable in the value of Diversegy's book of business for IDT."

107.    IDT gave an example of Rodriguez's alleged fraudulent conduct asserting that "[a]t 9:52 AM Eastern Time on November 16, 2013, IDT's Alan Schwab emailed Alex Rodriguez requesting his projection for renewal rates. Just 13 minutes later, Mr. Rodriguez replied: 5LINX business will be at about 50% to possibly as high as 55 or 60%. EPIQ/DCP will be north of 85%, with DCP possibly at 95%." IDT asserted that Rodriguez's projection was not based on due inquiry, that he had no basis for his projection, but was merely making "a guess".

108.    IDT alleged further that it "relied on the Management Sellers' representations concerning the customer list and their projections" and that "on the basis of those representations, IDT signed

the UPA with the Sellers on December 5, 2013." IDT alleged that they were damaged to the tune of seven figures and that the Diversegy book of business promised was a fraud.

109.     Based on information and belief, IDT and Genie (who employed Khavari after his employment with Diversegy), relied upon Khavari for information regarding its allegations in arbitration.

110.     IDT alleged that "Section 10 [of the UPA] addresses the governing law and dispute-resolution procedures. Under Section 10.10, the UPA is governed by and to be construed in accordance with New Jersey law. Section 10.11 provides for binding AAA arbitration of claims "arising from or relating to´ the UPA" or "any breach hereof.""

111.     IDT claimed that there was a breach of certain indemnification obligations arising from Webb's first lawsuit and a demand letter they had recently received from Mr. Webb.

112.     IDT summarized the first lawsuit and Mr. Webb's claims in that suit. IDT asserted that Management Sellers had reneged on their promise to indemnify the purchasers for that litigation.

113.     In response, Webb objected to jurisdiction based on the forged UPA and requested an evidentiary hearing on the issue. Without waiving his challenge to jurisdiction, Webb raised counterclaims against IDT and Shuk and cross-sued Diversergy, Rodriguez, Tujague, Garcia, Khavari and Dominion.

114.     Webb also moved to disqualify the arbitrator who voluntarily disclosed that he had taken part in a business transaction with Defendant Tujague who sought to buy a client's jet.[22] When the arbitrator refused to disqualify himself, Webb re-urged his motion citing legal precedent that any award by the arbitrator benefitting Tujague would be presumed improper and challenged in federal

---

[22] This apparent connection between Defendant Tujague and the arbitrator, coupled with Tujague's attorneys campaign support of Molberg, taints this case. For me this case is clouded in the appearances of impropriety and begs the question of what other inappropriate conduct is concealed. The truth lies in the original UPA.

court.

115.    On September 13, 2016, at what was supposed to be an evidentiary hearing on Mr. Webb's forgery assertion, the arbitrator suggested that the parties allow a court to decide the forgery issue. The parties agreed (and the arbitrator ordered) that Webb should bring his lawsuit and bifurcate the issue of forgery in *a court of appropriate jurisdiction.*

116.    During that hearing, without objection, Webb gave notice that he would bring his action in Texas.

## C.    SECOND LAWSUIT AND APPEAL

117.    After being roped into arbitration and ordered to bring his defense and lawsuit in a "court of appropriate jurisdiction" Webb filed his second action in Dallas, Texas.[23]

118.    Unlike the first suit, the second lawsuit was filed in Dallas because Webb was forced to defend himself in arbitration in Dallas.

119.    Respondents moved to have the matter dismissed on the basis of collateral estoppel arguing that forum selection had already been litigated and Webb was required to file his action in New Jersey.

120.    Webb responded in opposition that the forgery had not been litigated and essentially the posture of the case had changed due to arbitration. Pursuant to the arbitration order, Webb moved to bifurcate the forgery.

121.    The trial court dismissed without prejudice on the basis of forum selection "in favor of presentation in an appropriate forum in Essex County, New Jersey, or before the arbitrator in the current arbitration proceeding, should the arbitrator reconsider his ruling regarding judicial determination of the issue of forgery."

---

[23] *Webb v. Diversegy, et al.,* Cause No. DC-16-14649.

122.    On appeal Webb argued that the forum selection clause of the UPA did not apply, collateral estoppel did not apply and that it did not make sense to litigate forgery in New Jersey while an arbitration was pending in Texas.

123.    The trial court's judgment was affirmed.[24]  The Texas court of appeals held that "Webb seeks to bootstrap from the contractually required arbitration in Dallas to [Texas Arbitration Act] section 171.023 superseding the forum selection clause. He cites no authority to support that position and we have found none. Ample precedent supports the forum selection clause's superiority."[25]

124.    Based on information and belief the arbitration claims were presumably resolved and the arbitration did not resume because certain parties failed to pay fees.

125.    The outcome of the claims asserted is unknown to Plaintiff. Defendants once again kept Plaintiff out of the details, despite having sued him...indicating both sides have unclean hands and have acted in bad faith.

126.    Further, notice has not been given to Plaintiff that he was absolved or cleared of the allegations raised by Defendants during the arbitration.

127.    Defendants had their own individual and collectively greed driven motivations for the wrongful conduct described herein. Tujague needed to get rid of the defunct company led by fraudulent Rodriguez and his sidekick Khavari. On the other hand, Genie needed to salvage a self-described "bad deal". None of the Defendants sought to communicate with Plaintiff for fear that their interests would be destroyed when their own unclean hands were revealed.

---

[24] *Webb v. Diversegy, LLC, et al,* No. 05-17-01258-CV, 2019 Tex. App. LEXIS 2005 (Tex. App. Mar. 13, 2019)
[25] Petition for review to the Texas Supreme Court was denied.  *Webb v. Diversegy, LLC*, 2019 Tex. LEXIS 906 (Tex., Sept. 6, 2019)

## VI.    CAUSES OF ACTION

### A.    FRAUDULENT TRANSFER OF STOCK AND VIOLATIONS OF 17 C.F.R. § 240.10b-5

128.    Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

129.    Defendants carried out a plan, scheme, and course of conduct which was intended to (a) deceive purchasers, the Plaintiff, the public and stakeholders; (b) artificially inflate the price of Diversegy's book of business and stock; (c) fraudulently transfer stock; and (d) cause purchasers and others to purchase Diversegy stock at artificially inflated prices.

130.    Defendant Sellers, among other misdeeds, (a) misrepresented the value of the company to purchasers by giving them manipulated and fraudulent account information including closing payables; (b) omitted Plaintiff's debt on disclosure schedule and other schedules and exhibits made part of the UPA; (c) misrepresented material information about open and closed accounts; (d) presented as open accounts those that were closed and (e) forged or caused to be forged the signature of Plaintiff on the UPA, consents, Waterfall Agreement and other purchase/sale transaction documents and agreements.

131.    Items a - d above are based on information and belief derived from the arbitration filings. Item (e) is based on Plaintiff's personal knowledge.

132.    Additionally, Defendants acted in concert to forge Plaintiff's signature to purchase/sale documents to consummate the sale of the company without Plaintiff's knowledge and to steal and convert Plaintiff's interests in the company as well as commissions owed to Plaintiff.

133.    Based on information and belief the forgery took place on or about December 2013 in Dallas, Texas and was committed by Defendants acting in concert with one another.

134.    The acts complained of herein were committed with every payment made for the purchase

made the subject of this lawsuit.

135. Further, Defendants made untrue statements and omitted material facts necessary to make the statements not misleading. For example, and not limited to, based on information and belief, the indebtedness to Plaintiff was omitted in certain sales documents.

136. Defendant Purchasers failed to investigate the veracity of the false signing party story upon the notice that it was false and to this date have still failed to do so; with the knowledge that to do so would be the undoing of the purchase.

137. Further, based on information and belief, Defendant Purchasers have misled its stakeholders in connection with the purchase or sale of securities by omitting the material fact that it purchased an insolvent company for $2,000,000.00.

138. The wrongful acts of Defendant Sellers, Purchasers and Doe were committed via the use of email, mail, texts, phone communications and meetings before, during, and after the sale of the company in 2013 at or near Dallas, Texas, Ireland and Newark, New Jersey.

139. These communication methods constitute violations of mail or wire fraud federal statutes, including 17 C.F.R. § 240.10b-5. The conduct complained of constitutes fraudulent stock transfers.

140. As a result of Defendants' conduct, Plaintiff has suffered great harm and damages.

141. Moreover, the actions of these defendants warrant the imposition of exemplary damages.

142. Additionally, the actions of these defendants warrant the imposition of a constructive trust on the business sold, formed, and operated and any and all securities, assets, revenues, profits or proceeds as a result of their wrongful actions. This constructive trust should extend to any continued payments received because of the sales transaction at issue.

143. Further, Tujague, Rodriguez and Khavari actions warrant the surrender of the shares of Diversegy stock conveyed to and held by them during the period they were breaching their

fiduciary duties and concealing these breaches from Plaintiff. Additionally, Defendant Sellers should be required to pay to Plaintiff any benefit they received as a result of their wrongful conduct.

**B.** **CONVERSION, FRAUD, COMMON LAW FRAUD, EQUITABLE FRAUD, MISREPRESENTATION AND CONCEALMENT**

144.     Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

*Misrepresentation:*

145.     In late 2013, 2014, and 2015 in communications occurring at or near Dallas, Texas Defendants Tujague, Rodriguez, Khavari and Doe made material misrepresentations to Plaintiff for the purpose of misleading Plaintiff about the sale of the company, his commissions and interests.   These same Defendants continued to mislead Plaintiff about his interests and compensation throughout the term of his employment in the fall of 2015.  Defendants continued to mislead Plaintiff about his interests and compensation through 2017 while making partial commissions payments and continuing to receive the benefits of Plaintiff's accounts.  Plaintiff had a pecuniary interest in the material misrepresentations made.

146.     Defendants knew the misrepresentations made were false, misleading or made with reckless disregard.

147.     Defendants made the misrepresentations with the intent that Plaintiff would rely on them in making business and personal financial decisions.   Plaintiff did in fact rely on the misrepresentations.

148.     Defendants' material misrepresentations proximately caused Plaintiff to suffer damages recoverable in this action.

149.     Defendants gave false information to Plaintiff for the purpose of misleading the Plaintiff.

150.     Defendants did not exercise reasonable care in communicating this information to Plaintiff.

151. Plaintiff justifiably relied on Defendants' representations in making business decisions including but not limited to the decision to continue working for Diversegy and thereby benefiting all defendants at his own financial peril and loss.

152. Defendants' misrepresentations proximately caused Plaintiff to suffer damages recoverable in this action.

*Conversion, Forgery and Fraud:*

153. Defendants converted hundreds of thousands of dollars owed to Plaintiff when they refused to pay the commissions earned by Plaintiff. Each of the Defendants received benefits because of this conversion.

154. All Defendants have refused to pay Plaintiff for the value of his shares.

155. Therefore, Defendants converted monies owed to Plaintiff and converted the value of his shares in Diversegy.

156. Defendants Tujague and Doe committed conversion and acted fraudulently when without authorization or consent they sold Plaintiff's shares and refused to compensate him for the same.

157. Defendants Tujague and Doe committed conversion and acted fraudulently when they refused to pay Plaintiff his share of the proceeds of the sale of the company.

158. Defendants Tujague and Doe acted fraudulently when they refused to provide certificates of minutes to Plaintiff.

159. Genie and Dominion Defendants committed conversion when they refused to make contingent payments to Plaintiff.

160. Defendants Diversegy, IDT and Genie ratified the fraudulent acts of Tujague, Rodriguez, Khavari and Doe when after receiving notice of Plaintiff's claims for payment and the forgery, they did nothing but continue to receive the benefit of Plaintiff's loss and refuse payment. Further

Defendants Diversegy, IDT and Genie converted commissions owed to Plaintiff when they only paid him partially in 2015, 2016 and 2017.

161.    The UPA is a forgery and a fraud. It was entered to and created fraudulently.  Defendants committed fraud in the execution, formation, and performance of the UPA.

*Concealment:*

162.    Defendants fraudulently concealed the material facts about the sales transaction from Plaintiff, including the UPA, accounting, disbursements, payment of interests to shareholders, and continued compensation on certain contingent accounts after the sale.  This concealment continued throughout the term of Plaintiff's employment.

163.    This concealment impeded Plaintiff's pursuit of the claims herein and those raised in all legal proceedings related to these claims.

164.    The unlawful acts complained of herein arose and occurred by and through communications occurring at or near Dallas, Texas, Ireland, and Newark, New Jersey via mail, email, texts, meetings, telephone calls, and other means of communication.

165.    All Defendants acted in concert with and without another willfully, intentionally and with malice, warranting the imposition of exemplary damages.

166.    As a result of Defendants' wrongful conduct, Plaintiff has suffered great harm and damages.

### C.    **FRAUD BY FORGERY**

167.    Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

168.    Defendants Tujague, Rodriguez and Khavari forged Plaintiff's signature on various documents to sell the company without his authorization and to steal Plaintiff's earned and future

commissions.

169.  As a result of Defendants' wrongful conduct, Plaintiff has suffered great harm and damages.

### D.  BREACH OF CONTRACT

170.  Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

*Breach of Commissions Contract*

171.  Defendant Diversegy breached its commissions contract with Plaintiff when it failed to pay him for sales closed by him and sales representatives in his sales channels. Each account closed by Plaintiff constituted a new obligation and contract for payment under the commissions contract. Each renewed contract, renewed for multiple year terms, closed by Plaintiff constituted a new obligation and contract for payment under the commissions contract. Plaintiff is owed for renewed contracts arising after 2015 as evidenced by partial commission payments received in 2017.

*Breach of Diversegy Operating Agreement*

172.  Defendants Tujague, Rodriguez and Khavari breached the Diversegy Operating Agreement when they colluded and conspired to sell the company solely to cover their own debt, by converting Plaintiff's earned commissions.

173.  Defendants breached the Diversegy Operating Agreement when they refused to provide an accounting, books, records and other documentation supporting the sale of the Diversegy and DCP when requested by Plaintiff prior to the consummation of the sale.

*Breach of UPA*

174.  Although Plaintiff denies that he signed the UPA and other documents related to the purchase and sale of Diversegy, LLC, and therefore disputes the validity of the same as against

him and asserts the UPA is void, to the extent that the Agreement is deemed valid, Plaintiff asserts

in the alternative the following breaches of the UPA by Defendants:

a. Defendants Diversegy, Tujague, IDT, and Shuk breached the UPA when they failed to make just compensation to Plaintiff based on initial and/or renewed terms of the agreed contracts, accounts and contingent payments.

b. Defendants breached the UPA when they refused to provide an audit, accounting, records and other documentation showing the sale of the companies when requested by Plaintiff.

c. Defendants IDT and Genie breached the UPA when they failed to grant the Plaintiff a security interest against the units to secure the purchasers' obligations, including the obligation to compensate Plaintiff for his units.

d. Defendant Escrow Agent and Managing Seller Tujague breached terms of the UPA when he failed to get written authorization or consent from Plaintiff to sell the company or Plaintiff's interests in the company.

e. Defendant Escrow Agent and Managing Seller Tujague breached terms of the UPA when he failed to disclose the known breach of the compensation/commission agreement at issue.

f. Defendant Tujague and John Doe breached the UPA and accompanying transaction agreements when they failed to secure and maintain the originals of said documents.

g. Defendants Tujague, Rodriguez and Kavari breached the UPA:

1. when they misrepresented the value of the company to purchasers by giving them manipulated and fraudulent account information, balance sheet and financial statements;

2. when they omitted Plaintiff's debt and commissions contract on its disclosure schedule and contracts schedule;

3. when they failed to disclose the Purchased companies' indebtedness to Plaintiff;

4. when they misrepresented material information about open and closed accounts;

5. when they presented as open accounts those that were closed; and

6. when they failed to disclose a material change in the terms and conditions of Plaintiff's commissions agreement, namely that they had refused to pay him pursuant to those terms.

h. Defendants Tujague, Rodrigues, Khavari and Doe breached the UPA when they made untrue statements and omitted material facts necessary to make the statements, information and documents contained or referenced therein not misleading.

175. All Defendants breached the UPA when they failed to fulfill their obligation to pay Plaintiff's compensation, commissions, expenses, reimbursements, and for the value of his interests/stock under terms which are still in full force and effect without penalty or other adverse consequence.

176. Defendants Diversegy, Tujague and Doe breached the UPA when they failed to deliver transaction documents with the true signature of Plaintiff.

177. Defendants Diversegy, Tujague and Doe breached the UPA when it failed to secure and deliver Plaintiff's executed resignation.

*Breach of Employment Contract*

178. Although Plaintiff denies that he signed the UPA and other documents related to the purchase and sale of Diversegy, LLC, and therefore disputes the validity of the same as against him and asserts the UPA is void, to the extent that the Agreement is deemed valid, Plaintiff asserts in the alternative, the following breach of employment contract by Genie Defendants.

179. Genie Defendants violated the employment contract with Plaintiff when it terminated the agreement in violation of its terms and failed to pay Plaintiff pursuant to its terms in the fall of 2015. Moreover, the contract was violated when Plaintiff was terminated in retaliation for bringing the first lawsuit and for reports of fraud and unethical conduct against Defendants. Moreover, the contract was violated when Plaintiff was prevented from meeting sales performance terms.

180. By engaging in the acts described in this Complaint, all Defendants have breached valid and enforceable contracts.

181. Plaintiff has suffered great harm and damages as a direct result of Defendants' breach of

the referenced contracts and other related valid and enforceable contracts. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

182.     Because of Defendant's breaches of contract, Plaintiff has been required to retain counsel to prosecute his claims.  Plaintiff has paid counsel for their reasonable attorneys' fees and expenses incurred because of previous litigation referenced herein and for consultation in preparation for this litigation.  Plaintiff is entitled to recover his reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

### E.     QUASI CONTRACT AND QUANTUM MERUIT

189.     Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

190.     Plaintiff provided sales, marketing and training services from the onset of operations of the company through the wrongful termination of his employment agreement in the fall of 2015. Prior to the sale of the company and through the time of his wrongful termination, Plaintiff provided sales services pursuant to a commissions agreement with the company.

191.     Defendants Tujague and Rodriguez promised Plaintiff he would be paid commissions for the sales he closed.  Plaintiff expected that he would be paid.  Defendants Tujague and Rodriguez refused to pay Plaintiff as promised.

192.     The contracts that Plaintiff closed were renewable contracts that required continuing and separate payments for the term of each renewed contract.  Some accounts had terms of 3 to 5 years with an option to renew.  Each renewed account was a new contract. Plaintiff relied on the Defendants' promise.

193.     Defendants received the benefit of Plaintiff's performance in compensation on the accounts at issue.

194. As a result of Defendants' conduct, Plaintiff has suffered great harm and damages.

### F.     UNJUST ENRICHMENT

193. Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

194. A claim for unjust enrichment rests on the equitable principle that one shall not be allowed to be enriched unjustly at the expense of another. *Miller v. Rodriguez*, Civil Action No. 3:16-cv-02744-PGS-DEA, 2020 U.S. Dist. LEXIS 55054, at *11 (D.N.J. Mar. 24, 2020).

195. All Defendants have unjustly benefited from and were enriched by Plaintiff's sales, withholding payment of his commissions earnings and further from stealing Plaintiff's ownership interests in the company.

196. To allow Defendants to retain those benefits without payment to Plaintiff would be unjust.

197. The wrongful conduct of Defendants proximately caused Plaintiff to suffer damages recoverable in this action.

### G.     CIVIL CONSPIRACY

198. Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

199. Defendants entered into an agreement and conspiracy to commit and facilitate the wrongful conduct described herein.

200. IDT knew or should have known that it misrepresented Diversegy's financial and operational condition to the public in multiple news releases published. All Defendants aided and abetted one another in this material misrepresentation.

201. These misrepresentations created the false impression to the public and stakeholders that IDT and Genie made a successful acquisition of a successful solvent company, thereby insulating

itself from any adverse blowback from its stakeholders or the public.

202.    Defendants knew of material problems in Diversegy's financial statements and disclosures but improperly failed to disclose these problems to the public, its stakeholders and Plaintiff. The specifics of these problems were within Defendants' exclusive control. This pattern of deception continued through the sales transaction period and based on information and belief was not disclosed publicly.

203.    Defendant Tujague engaged further in the conspiracy and acted in concert with Defendants Rodriguez and Khavari when he disbursed proceeds to other sellers but refused to disburse proceeds to Plaintiff over the period of four payments by purchasers from December 2013 through the summer of 2015. Additionally, these defendants acted in concert when Tujague concealed disclosure of the accounting of disbursements of the proceeds.

204.    The Defendants reached a meeting of the minds on the foregoing misdeeds, objectives, courses of action in whole or part and, in connection therewith, committed one or more unlawful acts or otherwise lawful acts for unlawful purposes.

205.    These Defendants committed the acts described herein with the knowledge or intent to injure Plaintiff or with reckless or negligent disregard for Plaintiff's rights and wellbeing and with reckless or negligent disregard for the truth..

206.    Defendants Tujague, Rodriguez and Khavari's agreement to fabricate a story that they, and they alone, observed Plaintiff sign the UPA is evidence of their criminal and malicious intent and demonstrated in the perjured affidavits signed by each.[26]

207.    The conspiracy described herein, and the actions taken in the course of its commission proximately injured Plaintiff. Plaintiff therefore seeks recovery of damages resulting therefrom.

---

[26] App. 04, Affidavits of Tujague, Rodriguez, and Khavari.

208.    The conspiracy described herein, and the actions taken in the course of its commission warrant the imposition of exemplary damages as they were committed maliciously.

## H.    BREACH OF FIDUCIARY DUTY

220.    Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

221.    As the Escrow Agent and closing attorney, Defendants Tujague owed to Plaintiff certain fiduciary duties of full disclosure, fair, honest dealing, candor, care, trust and loyalty, and utmost good faith. Defendant breached these duties by the acts and conduct complained of herein.

222.    Additionally, Defendants Tujague and Dominion breached fiduciary duties when they failed to compensate Plaintiff for his shares in Diversegy, commissions earned, and any contingent payments owed to Plaintiff after the sale of Diversegy.

223.    Further, all the wrongful acts of Defendants described herein breached the aforementioned fiduciary duties.

224.    To the extent Defendants Rodriguez and Khavari owed Plaintiff the same fiduciary duties, they similarly breached those same fiduciary duties by acting in concert with Defendants Tujague and Doe.

225.    Further, to the extent Defendants IDT and Genie owed Plaintiff the same or other fiduciary duties, they similarly breached those fiduciary duties by their wrongful conduct described herein.

226.    Defendants acted in concert with and without another willfully, intentionally and with malice, warranting the imposition of exemplary damages.

227.    The wrongful conduct of Defendants described herein and the actions taken in the course of its commission proximately injured Plaintiff. Plaintiff therefore seeks recovery of damages resulting therefrom.

## I.    VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (CIVIL RICO) AND OTHER FEDERAL LAWS

230.    Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

231.    Based on information and belief, personal knowledge, and information derived from the arbitration filings of Defendant IDT, Defendant Sellers carried out a plan, scheme, and course of conduct which was intended to (a) deceive purchasers, the Plaintiff, the public and stakeholders; (b) artificially inflate the price of Diversegy's book of business and stock; (c) transact at arm's length a multimillion dollar sale and purchase at an artificial price misleading Plaintiff and others and (d) cause purchasers and others to purchase Diversegy stock at artificially inflated prices.

232.    The wrongful acts of Defendants individually, jointly, with and without the other show that they engaged in a continuous pattern of racketeering predicated on violations of 18 U.S.C. §§ 1962, and other crimes including but not limited to, for example forgery, fraud, and theft (conversion).

233.    The wrongful acts of Defendants individually, jointly, with and without the other were in connection with the sale, acquisition, establishment, operation, and control of an enterprise, namely Diversegy and the association-in-fact between Tujague, Rodriguez and Khavari.

234.    As shown herein, a pattern exists where at least two or more predicate acts that are related to each other and constitute or threaten long-term criminal activity, namely forgery, fraud and theft committed by Defendants.

235.    Further, the long-term criminal activity spanning now over several years, is the continued perjury, fraud and concealment of the forgery and other fraudulent acts complained of herein, that to this date these defendants continue to benefit therefrom.

236.    The wrongful acts of Defendants were committed via the use of email, mail, texts, phone communications and meetings during the course of the sale of the company in 2013 and thereafter

at or near Dallas, Texas, Ireland and Newark, New Jersey. These communication methods constitute violations of mail or wire fraud federal statutes and form RICO predicate acts arising and occurring at or near Dallas, Texas, Ireland, and Newark, New Jersey.

237. The wrongful egregious and malicious acts of Defendants warrant and justify punitive and treble damages.

238. As shown herein, as a proximate cause and direct result of Defendants unlawful acts, Plaintiff was injured in violation of section 1962.

### J. BREACH OF DUTY OF CANDOR AND LEGAL MALPRACTICE

240. Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

241. Defendant John Doe breached his duty of candor when (1) he failed to disclose to the court his knowledge about sales transaction documents not signed by Plaintiff; (2) he failed to investigate the forgery and fraud disclosed by Plaintiff, and averred by IDT in arbitration; (3) during the arbitration he failed to disclose the material fact that Plaintiff was not involved in the sales transaction, and did not participate in the disclosure of account information or projections of account activity or performance; (4) he failed in his obligation to prevent the trier of fact from being misled by false evidence; (5) he failed to come forward with the original UPA; and (6) he failed to disclose that he participated in securing any signature to the UPA.

242. Defendant Doe knew, should have known, or was reckless in disregarding facts which were easily available, concerning Defendant Sellers brazen fraud and Genie Defendants wrongful suit of Plaintiff in arbitration and Genie Defendants acquiescence to and ultimate joinder in the fraud.

243. The law firm Hallett & Perrin should be disqualified from representing Diversegy or other parties in this matter. Likewise, the law firms of Gray, Reed & McGraw, P.C. that represented

Dominion Defendants and Gruber, Hurst, Johansen, Hail, Shank, LLP that represented Defendant Rodriguez in the aforementioned cases should be disqualified, along with Hallett & Perrin P.C.

244.    R.P.C. 3.7 authorizes disqualification of the client's attorney where that attorney's trial testimony is "necessary" and "likely." A purpose of that limited remedy is to prevent unfairness to the opposing party. These firms and their lawyers should be disqualified because Defendant Tujague claimed he gave the original UPA to his attorney. That attorney has testimony that is necessary and likely to prevent unfairness in this case.

245.    Further, questions surrounding the drafting and submission of the perjured "Rodriguez affidavits" is an issue that makes these attorneys testimony necessary and likely to prevent unfairness. These attorneys continued to rely upon the perjured affidavits after having received notice they were fraudulent by Plaintiff, an expert forensic examiner and disinterested former Diversegy co-founder and Management Seller.

246.    Further, Attorney Stevens of Hallet & Perrin argued that he would not have submitted perjured evidence putting at issue what care and due diligence was taken to ensure he did no such thing.[27] What action did he take to ensure no fraud was being committed upon the Court?

247.    Additionally, the three law firms funded the trial judge's political campaigns and made contributions within days of the motions to transfer and dismiss in 2014 and 2017 respectively. Their substantial contributions and the timing of them create the appearance of impropriety and their testimony is necessary and likely to prevent unfairness.

248.    Defendants acted in concert with and without another willfully, intentionally and with malice, warranting the imposition of exemplary damages.

249.    It was foreseeable that Plaintiff would have been injured by Defendant Doe's conduct. As

---

[27] App. 03, Excerpt of Transcript,57:1-5.

a proximate cause and direct result of Defendants' unlawful acts, Plaintiff was injured.

250.     Defendant Tujague recently disclosed that he gave the UPA to Attorney York of Gray, Reed & McGraw, P.C. That attorney should be ordered to make the original "wet imprinted" signature page available for inspection immediately.

## K.     FRAUD UPON THE COURT

251.     Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

252.     Defendants committed fraud upon the court by their unlawful acts described herein.

253.     Defendants intended to not only defraud Plaintiff, but to defraud the Texas courts multiple times beginning at the trial court, through the courts of appeals and arbitration. These Defendants intended for the trial court, arbitrator and courts of appeal to rely upon the perjured affidavits.

254.     Before this Court, Defendants again rely upon and have put forth the Rodriguez affidavits in this proceeding. Plaintiff requests an evidentiary hearing and findings of forgery and fraud.

255.     Further, upon a finding of forgery, fraud and reliance upon the perjured Rodriguez affidavits, every ruling, order and judgment by courts relying upon them should be set aside in the interests of justice.

## L.     VIOLATION OF THE SECURITIES AND EXCHANGE ACT OF 1934 (ACT) 15 U.S.C.S. §§ 78j(b)

256.     Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

257.     This claim and all others herein arise out of the same course of fraudulent and deceitful conduct by all Defendants. The specifics of these problems and allegations, as well as necessary information, were at all times relevant hereto within Defendants' knowledge and exclusive control.

258.     Additionally, based on information and belief, personal knowledge, and information

derived from the arbitration filings of Genie Defendants and business news/media, Defendants carried out a plan, scheme, and course of conduct which was intended to (a) deceive purchasers, the Plaintiff and the public and stakeholders; (b) artificially inflate the price of Diversegy's book of business and stock; (c) transact at arm's length a multimillion dollar sale and purchase at an artificial price misleading Plaintiff and others and (d) cause purchasers and others to purchase Diversegy stock at artificially inflated prices. Plaintiff seeks to discover whether the securities at issue were registered at the time of sale.

259. The wrongful acts of Defendants were committed via the use of email, mail, media, texts, phone communications and meetings during the course of the sale of the company in 2013 and thereafter at or near Dallas, Texas, Ireland and Newark, New Jersey. These communication methods constitute violations of mail or wire fraud federal statutes including Section 15 U.S.C.S. §§ 78j(b) of the Act.

260. As a proximate cause and direct result of Defendants' unlawful acts, Plaintiff was injured.

**M.** **VIOLATION OF CERTAIN OTHER SECURITIES AND ANTITRUST LAWS**

262. Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

263. To the extent Plaintiff maintains shares, he brings this action to enjoin acts of management which threaten his property interests. Defendants, by the wrongful conduct described above, have acted in bad faith, with unclean hands, and disregard of the relative rights of its members, including Plaintiff.

264. To the extent Plaintiff does not maintain shares, he asserts that the wrongful conduct of Defendants constitutes a fraudulent transfer of stock in violation of certain federal and state laws.

265. This claim and all others herein arise out of the same course of fraudulent and deceitful

conduct by all Defendants. The specifics of these problems and allegations, as well as necessary information, were at all times within Defendants' knowledge and exclusive control.

266.    As a proximate cause and direct result of Defendants' unlawful acts, Plaintiff was injured.

### N.    DECLARATORY JUDGMENT

267.    Plaintiff realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein and reiterated here in their entirety.

268.    Plaintiff seeks declaratory judgment pursuant to 28 U.S.C. §2201 to declare the rights and other legal relations between the parties.

### VI.    DEMAND FOR JURY

271.    Plaintiff demands a jury trial and tenders the appropriate fee.

### VII.    CONCLUSION

I was lied to and lied on. Three men lied and said I did something I did not do.  I never got to confront them or cross examine them. They dropped three perjured affidavits on the judge's desk and that judge denied me the right to challenge those affidavits at every turn. When I tried this case in Texas, the Texas court told me to go to New Jersey. When the defendants sued me in Arbitration and I tried to defend myself, I was told to go to New Jersey.  When I was told to go to a "court of appropriate jurisdiction" I went back to the Texas Court and was told again to go to New Jersey. I appealed in Texas and was told to go to New Jersey.

I have consulted with legal scholars, law professors, litigation attorneys, appellate attorneys, a former Texas Supreme Court Justice, and they all asked me the same two questions… What was the ruling on forgery? and… What were the Court's findings on the merits?  Some of these same legal minds now tell me my accusers and defendants will argue that I am now estopped in New Jersey or that res judicata will prevent me from getting justice in New Jersey.[28]  I ask, how can I be estopped if there's no ruling or final judgment on the merits in Texas? According to Texas, I belong in New Jersey.

There's never been a trier of fact, there's never been cross examination or confrontation of the Rodriguez affidavits, and never - still to this day, has there been production of the original document the accusers lied and said they saw me sign.

My prayer is that this Court will give me my day in court with a jury, cross examination and confrontation of the accusers and the original document that they claim bears my signature.  I

---

[28] But see letter dated 07/19/2017 from defense counsel (App. 006) asserting New Jersey state or federal court is proper.

merely ask that I finally be allowed to exercise my constitutional right to confront my accusers. I pray that any attempt by the Defendants to rely on the UPA is met with an order that the original UPA be produced bearing my original "wet" and imprinted signature. I pray that my forensic document examiner expert be allowed to inspect any alleged original document.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court:

A.      Order that Attorney York produce the original document bearing Plaintiff's original signature;

B.      Order the disqualification of law firms (i) Hallett & Perrin, (ii) Gray, Reed & McGraw, P.C. and (iii) Gruber, Hurst, Johansen, Hail, Shank, LLP.

C.      Enter judgment against Defendants in an amount to make him whole for all damages suffered by him as a result of Defendants' violations of the law herein, including, but not limited to, damages for back pay and benefits, front pay, compensatory damages, damages for mental anguish, liquidated damages in an amount equal to actual damages, exemplary damages as a result of the Defendants' conduct;

D.      Defendants' surrender of Plaintiff's units conveyed to him during his employment with Diversegy or payment of their fair market value;

E.      The imposition of a constructive trust on the business sold, formed and operated and any and all securities, assets, revenues, profits or proceeds as a result of their wrongful actions. This constructive trust should extend to any continued payments received as a result of the sales transaction at issue;

F.      The surrender of the shares of Diversegy stock conveyed to and held by Defendants because of the fraud by forgery. Additionally, Defendant Sellers should be required to pay back any benefit they received because of their wrongful conduct.

G.      Upon a finding of fraud upon the court, a set aside all other judgments, orders, and rulings based on or found to have relied upon the Rodriguez affidavits;

H.      Award attorney's fees, expert witness fees, costs of bringing this action, and all other damages recoverable plus prejudgment, post judgment and any other interest to which Plaintiff may be entitled.

I.      Enjoin Defendants from further violating the federal laws herein;

J.      Declaratory judgment of the relationship of the parties herein and Plaintiff's rights arising therefrom;

K.      Grant all other relief that Plaintiff is justly entitled to under law and equity, and that is just

and proper.

I declare under penalty of perjury that the foregoing is true and correct.
/s/Johnny E. Webb, III

Signed this 1st day of November, 2022.

Respectfully Submitted,

***/s/Johnny E. Webb, III***
JOHNNY E. WEBB, III
*Pro Se*
2623 Newman
Houston, Texas 77098
Telephone: (901) 606-5783
jewebb3@yahoo.com

## CERTIFICATE OF SERVICE

I certify that the foregoing was submitted to the following parties of record by email and filed with

Court via email to ecfhelp@njd.uscourts.gov on this the 1st day of November, 2022:


Joel Kreitzman
One River Centre
331 Newman Springs Road
Building 3, Suite #310
Red Bank, NJ, 07701-5692
*Counsel for Dominion Gas Holding, LP and Lucien J. Tujague, Jr.*

Bruce Schlanger
520 Broad Street, 4th Floor
Newark, New Jersey 07102
(973) 438-3500
bschlanger@genie.com
*Counsel for Defendants Diversegy, LLC,*
*IDT Energy, Inc. and Genie Energy*
*Services, LLC*

Michael A. Charish
Charish Law Group P.C.
347 Fifth Avenue, Suite 1402
New York, New York 10016

(646) 328-0183
michael@charish.law
*Counsel for Defendants Diversegy, LLC,*
*IDT Energy, Inc. and Genie Energy*
*Services, LLC*

John Scura
Mark Matri
Scura, Wigfield, Heyer, Stevens & Cammarota, LLP
1599 Hamburg Turnpike
Wayne, NJ  07470
(973) 696-8391
jscura@scura.com
mmatri@scura.com
*Counsel for Defendant Sam Khavari*


/s/Johnny E. Webb, III
Johnny E. Webb, III